**Lavarita D. MERIWETHER,**
**Plaintiff-Appellant,**

v.

**Gordon H. FAULKNER, et al.,**
**Defendants-Appellees.**

**No. 86–1144.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1987.
Decided June 4, 1987.

William D. Heinz, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Michael A. Schoening, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Plaintiff,[1] currently an inmate at the Indiana State Prison in Michigan City and previously at the Indiana State Reformato-

---

1. Plaintiff's counsel naturally refers to the transsexual plaintiff as "she" whereas defendants' counsel refers to plaintiff as "he." Because in reviewing the dismissal of plaintiff's complaint we must accept the factual allegations as true, we will herein refer to plaintiff as "she." In so doing, however, we intimate no view as to the factual merits of plaintiff's action.

ry in Pendleton,[2] brought this action under 42 U.S.C. § 1983 challenging the available medical care and the conditions of confinement in the Indiana Department of Corrections. Named as defendants are Gordon Faulkner, Commissioner of the Indiana Department of Corrections; Norman Owen, Superintendent of the Indiana Reformatory at Pendleton; Han Chul Choi, M.D., Medical Director at the Pendleton institution; and two other officials of the Indiana Department of Corrections. Pursuant to defendants' motion, the district court dismissed plaintiff's complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Plaintiff appeals this dismissal and we reverse.

### I. *Factual Background*

In reviewing a dismissal under Rule 12(b)(6), the factual allegations contained in the plaintiff's complaint must be taken as true and must be viewed, along with all reasonable inferences to be drawn therefrom, in the light most favorable to the plaintiff. *Doe v. St. Joseph's Hospital*, 788 F.2d 411, 414 (7th Cir.1986). The following discussion is therefore drawn directly from plaintiff's complaint.

Since May 1982, plaintiff has been serving a thirty-five year sentence for murder. She is a pre-operative transsexual suffering from gender dysphoria, a medically recognized psychological disorder. She has been chemically (although not surgically) castrated[3] as a result of approximately nine years of estrogen therapy under the supervision of physicians and has undergone surgical augmentation of her facial structure, breasts, and hips so as to alter her body shape to resemble that of a biological female. She has feminine mannerisms, wears makeup and feminine clothing and undergarments when permitted, considers herself to be a female, and in fact has been living as a female since the age of fourteen.[4]

After being sentenced in 1982, plaintiff was transferred to the Department of Correction's Reception-Diagnostic Center for evaluation and classification. Although the medical examinations and evaluations conducted there supported a diagnosis of gender dysphoria, the consensus of the staff was to treat her as any other anatomical male. She was therefore assigned to the Indiana State Prison for commitment without a prescription or authorization for the use of hormone supplements.

Since the inception of her incarceration, plaintiff has been denied all medical treatment—chemical, psychiatric, or otherwise—for her gender dysphoria and related medical needs. The Medical Director at the Pendleton institution, Dr. Choi, has allegedly made humiliating remarks about plaintiff's need for estrogen and apparently once told her that "as long as she was in the Department of Corrections she would never receive the medication [estrogen] and that he would make sure of this." (Pl. Original *Pro Se* Complaint, Allegation I, Pl. App. 29). Plaintiff has suffered severe withdrawal symptoms as a result of the termination of estrogen therapy after nine years and has failed to receive any treatment for problems associated with silicone surgical implants.

Plaintiff has been confined in segregated "deadlock" in the protective custody units of the Indiana State Prison at Michigan City and the Pendleton Reformatory for periods of up to five and one-half months. While in the general prison population and in segregation, she alleges that she has been the victim of attempted and completed acts of violence and sexual assault. In

---

**2.** Plaintiff was originally assigned to the Indiana State Prison in Michigan City. On February 3, 1983, she was transferred to the Indiana State Reformatory at Pendleton for reasons which are unclear on the record but which according to the district court were unrelated to this action. (Pl.App. 2). While this appeal was pending, she was transferred back to the Michigan City facility.

**3.** The district court's opinion indicates that part of plaintiff's penis has been amputated but does not describe the circumstances surrounding the amputation (Pl.App. 9).

**4.** At the time the district court rendered its decision on January 8, 1986, plaintiff was twenty-seven years old. At oral argument plaintiff's counsel related that she was briefly married to a male Marine.

addition, she claims that she has been subjected to harassment by prison officers and has been forced to strip in front of officers and other inmates.

Appearing *pro se,* plaintiff brought this § 1983 action in November 1983. Counsel was appointed to represent plaintiff and an amended complaint was filed in May 1985. The complaint alleged violations of her rights under the First, Eighth, Ninth and Fourteenth Amendments of the Constitution and sought monetary, declaratory, and injunctive relief. The district court dismissed the complaint for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The court rejected plaintiff's claim for adequate medical care under the Eighth Amendment because it found that there was no "serious" medical need involved. It viewed the claim as a request for "elective medication" to maintain "a physical appearance and life style in order to satisfy [her] psychological belief." (Pl.App. 12, 14). The court also rejected plaintiff's conditions of confinement claim, concluding that protective custody was "a means of assuring the safe and efficient operation of a prison on a day-to-day basis." (Pl.App. 12). The court did not address plaintiff's allegations that she had been victimized by sexual assault, harassment, and invasions of privacy.

## II. *Medical Care*

Plaintiff initially contends that the defendants' failure to provide any medical treatment for her gender dysphoria constitutes a violation of her right under the Eighth Amendment to adequate medical care. In reviewing the sufficiency of her claim, we apply the familiar standard set out in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80, that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

A state has an affirmative obligation under the Eighth Amendment "to provide persons in its custody with a medical care system that meets minimal stan-

dards of adequacy." *Benson v. Cady,* 761 F.2d 335, 339 (7th Cir.1985) (quoting *Wellman v. Faulkner,* 715 F.2d 269, 271 (7th Cir.1983), certiorari denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885). However, not every claim by a prisoner alleging inadequate medical care states a constitutional violation. The Supreme Court has limited recovery under the Eighth Amendment to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251. Mere negligence on the part of a physician in diagnosing or treating a medical condition will not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* at 106, 97 S.Ct. at 292.

In dismissing plaintiff's Eighth Amendment claim, the district court concluded that gender dysphoria was not a "serious" medical need. Noting that the complaint presented no perilous or life-threatening situations, it instead characterized plaintiff's request for estrogen therapy as "elective medication" necessary only to maintain "a physical appearance and life style in order to satisfy [her] psychological belief." (Pl.App. 12, 14). In the court's view, the denial of hormone treatment could not, as a matter of law, constitute deliberate indifference to a serious medical need.

The defendants echo the district court's analysis on appeal, describing plaintiff's claim as a request for cosmetic treatment to promote and maintain her current life style and appearance and not as one for treatment of a medical condition. This argument ignores the fact that in reviewing a motion to dismiss, a court of appeals is obligated to take the plaintiff's allegations as true. Transsexualism has been recognized as a serious psychiatric disorder. In *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1083 n. 3 (7th Cir.1984), certiorari denied, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304, this Court described transsexualism as:

a condition that exists when a physiologically normal person (*i.e.,* not a hermaphrodite—a person whose sex is not

clearly defined due to a congenital condition) experiences discomfort or discontent about nature's choice of his or her particular sex and prefers to be the other sex. This discomfort is generally accompanied by a desire to utilize hormonal, surgical, and civil procedures to allow the individual to live in his or her preferred sex role. The diagnosis is appropriate only if the discomfort has been continuous for at least two years, and is not due to another mental disorder, such as schizophrenia.... [S]ee generally American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, § 302.5x (3d ed. 1980); Edgerton, Langman, Schmidt & Sheppe, Psychological Considerations of Gender Reassignment Surgery, 9 Clinics in Plastic Surgery 355, 357 (1982); Comment, The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma, 7 Conn.L.Rev. 288, 288 n. 1 (1975); Comment, Transsexualism, Sex Reassignment Surgery, and the Law, 56 Cornell L.Rev. 963, 963 n. 1 (1971).[5]

Transsexualism is not voluntarily assumed and is not a matter of sexual preference.[6] Sommers v. Budget Marketing, Inc., 667 F.2d 748, 748 n. 2 (8th Cir.1982).

Other courts have recognized transsexualism as "a very complex medical and psychological problem." Pinneke v. Preisser, 623 F.2d 546, 549 (8th Cir.1980) (quoting Doe v. Minnesota Dep't of Public Welfare, 257 N.W.2d 816, 819 (Minn.1977)); see also Rush v. Parham, 440 F.Supp. 383 (N.D.Ga. 1977), reversed on other grounds, 625 F.2d 1150 (5th Cir.1980); G.B. v. Lackner, 80 Cal.App.3d 64, 145 Cal.Rptr. 555 (1978); J.D. v. Lackner, 80 Cal.App.3d 90, 145 Cal. Rptr. 570 (1978). In each of these cases the court invalidated a state policy denying medicaid benefits for transsexual or "sex reassignment" surgery. In so doing, each court expressly rejected the notion that transsexual surgery is properly characterized as cosmetic surgery, concluding instead that such surgery is medically necessary for the treatment of transsexualism. See, e.g., J.D. v. Lackner, 80 Cal.App.3d at 96, 145 Cal.Rptr. at 572 ("We do not be-

**5.** This definition is in accord with the one used by the district court taken from the Merck Manual of Diagnosis and Therapy 1434 (14th ed. 1982):

A transsexual believes that he is the victim of a biologic accident, cruelly imprisoned within a body incompatible with his real sexual identity. Most are men who consider themselves to have feminine gender identity and regard their genitalia and masculine features with repugnance. Their primary objective in seeking psychiatric help is not to obtain psychologic treatment but to secure surgery that will give them as close an approximation as possible to a female body. The diagnosis is made only if the disturbance has been continuous (not limited to periods of stress) for at least 2 yr, is not symptomatic of another mental disorder such as schizophrenia, and is not associated with genital ambiguity or genetic abnormality.

In true male transsexuals the condition begins in early childhood with indulgence in girls' games, fantasies of being female, repugnance at the physical changes that attend puberty, and thereafter a quest for a feminine gender identity. Many transsexuals are adept at acquiring the skills that enable them to adopt a feminine gender identity. Some patients are satisfied with being given help to achieve a more feminine appearance, together with employment and an identity card that enables them to work and live in society as

women. Others are not content with changing their social identity but can be helped to achieve a more stable adjustment with small doses of feminizing hormones. Many transsexuals request feminizing operations in spite of the sacrifices entailed. The decision for surgery sometimes raises grave social and ethical problems. Since some follow-up studies have provided evidence that some true transsexuals achieve more happy and productive lives with the aid of surgery, it is justified in carefully selected men. After surgery, the patients need assistance with movement, gesture, and voice production. Some homosexual men, usually with serious personality problems, request reallocation surgery. The results in these patients are unsatisfactory from both a medical and social viewpoint.

**6.** Transsexuals are to be distinguished from homosexuals, who are sexually attracted to persons of the same sex, and transvestites, who are generally male heterosexuals who cross-dress, i.e., dress as females, for sexual arousal rather than sexual comfort. Both homosexuals and transvestites are "content with the sex into which they were born." Ulane, 742 F.2d at 1083 n. 3; see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders § 302.30 (3d ed. 1980); Wise & Meyer, Transvestism: Previous Findings and New Areas for Inquiry, 6 J. Sex & Marital Therapy 116, 116–120 (1980).

lieve, by the wildest stretch of the imagination, that such surgery can reasonably and logically be characterized as cosmetic.").

 Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a "serious medical need" under the *Estelle* formulation. See, e.g., *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1187 (5th Cir.1986); *Wellman v. Faulkner*, 715 F.2d 269, 273 (7th Cir.1983), certiorari denied, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885; *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir.1980), certiorari denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239; *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir.1979); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir.1977). There is no reason to treat transsexualism differently than any other psychiatric disorder. Thus contrary to the district court's determination, plaintiff's complaint does state a "serious medical need."

At oral argument it became apparent that the defendants' real argument is that the plaintiff is not in fact a transsexual. However, this argument, challenging the factual allegations contained in plaintiff's complaint, may not be made on a motion to dismiss, where, as already emphasized, the plaintiff's allegations must be accepted as true. The defendants of course remain free to challenge the factual basis of plaintiff's complaint in a motion for summary judgment pursuant to Fed.R.Civ.P. 56. It is worth noting though that plaintiff's original *pro se* complaint contained the names of two physicians in California who had been treating her for gender dysphoria and supervising her estrogen therapy. (Pl.App. 28).

In addition to stating a serious medical need, the complaint contains allegations indicating that the defendants were deliberately indifferent to that need. They have failed to provide the plaintiff with any kind of medical treatment, not merely hormone therapy, for her gender dysphoria. Moreover, Dr. Choi, the Medical Director at Pendleton, allegedly ridiculed the plaintiff about her condition and told her that he would make sure that she never received estrogen treatment as long as she was incarcerated!

We therefore conclude that plaintiff has stated a valid claim under the Eighth Amendment which, if proven, would entitle her to some kind of medical treatment. It is important to emphasize, however, that she does not have a right to any particular type of treatment, such as estrogen therapy which appears to be the focus of her complaint. The only two federal courts to have considered the issue have refused to recognize a constitutional right under the Eighth Amendment to estrogen therapy provided that some other treatment option is made available. See *Supre v. Ricketts*, 792 F.2d 958 (10th Cir.1986); *Lamb v. Maschner*, 633 F.Supp. 351 (D.Kansas 1986). Both of these courts nevertheless agreed that a transsexual inmate is constitutionally entitled to some type of medical treatment.

In *Supre v. Ricketts*, the plaintiff, an inmate in the Colorado Department of Corrections, was examined by two endocrinologists and a psychiatrist. These doctors considered estrogen treatment, but ultimately advised against it, citing the dangers associated with this controversial form of therapy. Instead they prescribed testosterone replacement therapy and mental health treatment consisting of a program of counseling by psychologists and psychiatrists. Given the wide variety of options available for the treatment of the plaintiff's psychological and physical medical conditions, the Tenth Circuit refused to hold that the decision not to provide the plaintiff with estrogen violated the Eighth Amendment as long as some treatment for gender dysphoria was provided. Similarly, in *Lamb v. Maschner*, the plaintiff, an inmate at the Kansas State Penitentiary, had been evaluated by medical doctors, psychologists, psychiatrists and social workers and was undergoing some type of mental treatment. As a result of this treatment, the court held that the defendant prison officials were not constitutionally required to provide the plaintiff with pre-operative hor-

mone treatment and a sex change operation.

The courts in *Supre* and *Lamb* both emphasized that a different result would be required in a case where there had been a total failure to provide any kind of medical attention at all. That is precisely the type of case before us. We agree with the Tenth Circuit that given the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment. But no such informed judgment has been made here. While we can and will not prescribe any overall plan of treatment, the plaintiff has stated a claim under the Eighth Amendment entitling her to some kind of medical care.

### III. *Conditions of Confinement*

■ The complaint raises a number of issues concerning the conditions of plaintiff's confinement. The district court addressed only plaintiff's challenge to her continued confinement in administrative segregation in the protective custody units of the Indiana State Prison and the Indiana State Reformatory. Construing the claim as one arising under the Due Process Clause of the Fourteenth Amendment, the court dismissed it, viewing plaintiff's confinement in administrative segregation as "a means of assuring the safe and efficient operation of a prison on a day-to-day basis." (Pl.App. 12).

We agree with the district court that the plaintiff cannot maintain a claim under the Due Process Clause. The Supreme Court has on numerous occasions held that an inmate's treatment by prison authorities is rarely subject to judicial oversight under the Due Process Clause. In *Vitek v. Jones*, 445 U.S. 480, 493, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, the Court explained:

[C]hanges in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause "[a]s long as the condi-

tions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him." *Montanye v. Haymes*, 427 U.S., at 242 [96 S.Ct. at 2547].

This result is necessitated by the facts that prison officials have broad administrative and discretionary authority over the institutions they manage and that prisoners retain only a narrow range of protected liberty interests. *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675.

In *Hewitt v. Helms*, the Supreme Court expressly held that a prisoner has no protected liberty interest in being confined in the general prison population rather than in restrictive segregation. Applying the standard set out in *Montanye* and *Vitek*, the Court reasoned that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." 459 U.S. at 468, 103 S.Ct. at 869. Given the broad uses of administrative segregation— "to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer"—the Court ruled that inmates should reasonably anticipate being confined in administrative segregation at some point in their incarceration. *Id.*

This Court has recently relied on the principles of *Hewitt* to reject a due process challenge to the lockdown restrictions in effect at the United States Penitentiary at Marion, Illinois, the federal maximum security prison. In *Caldwell v. Miller*, 790 F.2d 589 (7th Cir.1986), we held that even assuming the lockdown restrictions were permanent, the resulting conditions of confinement were not "qualitatively different from the punishment characteristically suffered by a convict," *id.* at 604–605 (quoting *Vitek*, 445 U.S. at 493, 100 S.Ct. at 1264), and hence did not implicate a protected liberty interest subject to judicial review under the Due Process Clause. Plaintiff's due process claim is indistinguishable from *Caldwell* and was therefore properly dismissed.

Rejecting the due process claim does not end our analysis of plaintiff's broad-based challenge to the conditions of her confinement. In *Caldwell* we expressly recognized that our holding did not preclude an inmate from attacking the conditions of his confinement as being violative of other substantive constitutional rights:

> In holding that the change in conditions at Marion does not implicate a protected liberty interest, we have not foreclosed a claim that specific restrictions, or the cumulative effect of restrictions, violate other substantive rights protected by the Constitution. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 [94 S.Ct. 2963, 2976, 41 L.Ed.2d 935].... The fact that the Constitution places substantive limitations on the conditions under which an inmate may be confined by the government does not mean that the state must conduct a hearing, or provide any other additional due-process protec-

tions, either before or after placing an inmate in such conditions.

790 F.2d at 605 n. 22. Thus while plaintiff's prolonged confinement in administrative segregation does not constitute a violation of due process, it may constitute cruel and unusual punishment in violation of the Eighth Amendment.[7]

The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification.[8] *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59; *Caldwell v. Miller*, 790 F.2d at 600. Conditions of confinement, being "part of the penalty that criminal offenders pay for their offenses against society," fall within the ambit of the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (quoting *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399). The Supreme Court has provided no static

---

**7.** In the district court plaintiff apparently advanced an equal protection claim for wrongful classification, although this argument has been relegated to a footnote in her appellate brief. (Pl.Br. 17 n. 18). She claims that she should be provided with the opportunity to demonstrate at an evidentiary hearing that she should be classified as a female and housed in a female correctional institute. Plaintiff's equal protection claim is foreclosed by our decision in *Shango v. Jurich*, 681 F.2d 1091 (7th Cir.1982), which held that a prison administrative decision may give rise to an equal protection claim only if the plaintiff can establish that "state officials had purposefully and intentionally discriminated against him." *Id.* at 1104. While complaining that the defendants' decision to classify her as a male was arbitrary and irrational, plaintiff has not alleged any "design or intent to discriminate." *Id.*

Furthermore, the Supreme Court has held that an inmate has no legitimate expectation under the Due Process Clause of being assigned to a particular institution or in receiving a particular security classification. In *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, the Court explained:

> The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison if, as is likely, the State has more than one correctional institution. The initial decision to assign the convict to a particular institution is not subject to audit under the Due

Process Clause, although the degree of confinement in one prison may be quite different from that in another.

See *Garza v. Miller*, 688 F.2d 480, 488 (7th Cir.1982), certiorari denied, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000; *Shango v. Jurich*, 681 F.2d at 1098. Although the plaintiff is precluded from attacking the classification decision *per se*, she remains free to challenge the conditions of her confinement, resulting from that classification, as being violative of her constitutional rights under the Eighth Amendment. See *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466; *Caldwell*, 790 F.2d at 605 n. 22.

**8.** It is unclear from the complaint whether the plaintiff is also advancing a claim that her substantive rights under the Due Process Clause have been violated. In *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251, the Supreme Court noted that the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners" and held that at least in the prison security context "the Due Process Clause affords [a prisoner] no greater protection than does the Cruel and Unusual Punishments Clause." We agree that in reviewing plaintiff's challenge regarding conditions of confinement the Eighth Amendment's prohibition against cruel and unusual punishment and any substantive rights afforded her under the Due Process Clause are coextensive.

"test" for determining whether the particular conditions of confinement constitute cruel and unusual punishment. Instead it has directed that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630). In determining whether there has been an Eighth Amendment violation a court must focus on "the totality of the conditions of confinement." *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir.1981); *French v. Owens*, 777 F.2d 1250, 1252 (7th Cir.1985), certiorari denied, —— U.S. ——, 107 S.Ct. 77, 93 L.Ed.2d 32. The Supreme Court has cautioned, however, that conditions are not unconstitutional simply because they are harsh and restrictive; such conditions are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

Plaintiff complains that by being confined in administrative segregation, she is denied adequate recreation, living space, educational and occupational rehabilitation opportunities, and associational rights for nonpunitive reasons. In *Caldwell*, we rejected a claim of cruel and unusual punishment arising out of the restrictions associated with the lockdown at the Marion Penitentiary. Among the conditions challenged by the plaintiff in *Caldwell* were restricted exercise privileges, a ban on religious services, suspension of contact visitation, and restrictions on direct access to the law library. We held that the total effect of these conditions "neither result[ed] in an 'unquestioned and serious deprivation of basic human needs,' *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59, ... nor [did] they cause intolerable or shocking prison conditions. *Id.* 452 U.S. at 347, 101 S.Ct. at 2399." 790 F.2d at 601 n. 16. Recognizing that the Constitution does not mandate that prisons be comfortable, we concluded that the challenged restrictions resulted in no more than inconvenience and discomfort. *Id.* at 601.

■ Of course our holding in *Caldwell* was influenced by the fact that Marion houses persons convicted of serious crimes and who while in prison have demonstrated a propensity to violence or escape. Such inmates cannot expect to be "free of discomfort." *Rhodes*, 452 U.S. at 349, 101 S.Ct. at 2400. In addition the duration of a prisoner's confinement in administrative segregation or under lockdown restrictions is certainly an important factor in evaluating whether the totality of the conditions of confinement constitute cruel and unusual punishment. Prisoners who are confined in administrative segregation for a relatively short period of time, over a number of months and even a number of years depending upon the type of inmates involved and the security risks present in the institution, cannot complain about the conditions of their confinement unless they are deprived of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. In contrast, the plaintiff here has thirty years remaining to serve on her sentence.

Whether a prisoner may be subjected to the restrictive and necessarily harsh conditions of administrative segregation, not resulting from his own misconduct, for such a long period of time is a very difficult question. See *Hewitt v. Helms*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9 (expressing concern that administrative segregation not be used as a pretext for indefinite confinement of an inmate). For example, we suggested in *Caldwell* that prolonged restriction on exercise that threatens an inmate's physical health could violate the Eighth Amendment. 790 F.2d at 600; cf. *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985) ("Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised."). Similarly, while we held in *French* that prisoners confined in protective custody have no right of equal access to the same vocational, academic and rehabilitation programs as those in the general prison population, 777 F.2d at 1256, it is more troubling to extend that holding to an

inmate who is required to serve a thirty-five-year sentence in segregation.

■ Obviously influencing whether prolonged segregation constitutes cruel and unusual punishment is the existence of feasible alternatives. We recognize that the administration of a prison is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935. As a general matter federal courts should be loath to inject themselves into the day-to-day administration and management of a prison. See, *e.g., Hewitt v. Helms,* 459 U.S. at 470, 474, 103 S.Ct. at 870, 872; *Rhodes v. Chapman,* 452 U.S. at 351–52, 101 S.Ct. at 2401–02. Prison officials must be accorded wide-ranging deference in matters of internal order and security, see *Caldwell,* 790 F.2d at 596, and a federal court should not substitute its judgment for theirs "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495; *Block v. Rutherford,* 468 U.S. 576, 584–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438. A prisoner such as the plaintiff poses particularly serious management problems for prison officials. Given her transsexual identity and unique physical characteristics, her being housed among male inmates in a general population cell would undoubtedly create, in the words of the district court, "a volatile and explosive situation." (Pl.App. 10). Under such circumstances it is unlikely that prison officials would be able to protect her from the violence, sexual assault, and harassment about which she complains.

Because of plaintiff's psychiatric and physical state, it may prove infeasible to fashion any kind of relief against the condition, namely, prolonged confinement in administrative segregation, she challenges. Nevertheless, it was premature for the district court to dismiss plaintiff's claim as a matter of law on the pleadings without ascertaining the actual conditions of plaintiff's confinement and the existence of any feasible alternatives.

In addition to her claim challenging her indefinite confinement in administrative segregation, plaintiff's complaint raises several other challenges to the conditions of her confinement. Specifically plaintiff alleges that she has been the victim of frequent sexual assaults and other acts of violence. She also alleges that prison guards have repeatedly and unnecessarily required her to strip in front of inmates and other correctional officers solely so that they might view her unique physical characteristics. The district court did not mention either of these claims in dismissing plaintiff's lawsuit. In view of our disposition of the claims concerning medical care and administrative segregation the district court should consider these latter two claims in the first instance.

■ This Court has repeatedly recognized that the failure of prison officials to protect an inmate from assaults by other inmates may rise to the level of an Eighth Amendment violation if the officials were "deliberately indifferent" to the strong likelihood of an attack. See *Watts v. Laurent,* 774 F.2d 168, 172 (7th Cir.1985), certiorari denied, — U.S. —, 106 S.Ct. 1466, 89 L.Ed.2d 722; *Walsh v. Brewer,* 733 F.2d 473, 476 (7th Cir.1984). A mere lack of due care on the part of prison officials is insufficient to justify liability under § 1983. See *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677. But if the assaults occurred so frequently as to be "pervasive," or if the plaintiff belonged to an "identifiable group of prisoners" for whom the risk of assault was "a serious problem of substantial dimensions," a court may infer deliberate indifference. *Walsh,* 733 F.2d at 476. The plaintiff here has alleged frequent assaults, and given that she is a transsexual housed in an all male prison, the risk of assault would appear to be sufficiently serious to require the defendants to take some minimal measures to protect her from assault, whether she is confined in administrative segregation or the general prison population.

Plaintiff's claim that the defendants have deliberately failed to protect her from sexual assault is somewhat in conflict with her

desire not to remain in administrative segregation indefinitely. As suggested above, however, placing the plaintiff in a general population cell appears to be an unacceptable and impractical solution. The complaint alleges that the assaults have continued while plaintiff has been confined in administrative segregation, and she certainly has a right under the Eighth Amendment to be protected from those assaults which occur as a result of the defendants' "deliberate indifference."

With respect to plaintiff's claim that she is regularly forced to strip before guards and other inmates, it should be noted that while a prisoner's expectation of privacy is extremely limited in light of the overriding need to maintain institutional order and security, see *Bell v. Wolfish,* 441 U.S. 520, 537, 558–60, 99 S.Ct. 1861, 1873, 1884–85, 60 L.Ed.2d 447, the Supreme Court has recognized that a prisoner retains a remedy for "calculated harassment unrelated to prison needs." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393. The Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59; see *Hudson,* 468 U.S. at 530, 104 S.Ct. at 3202, *Smith v. Chrans,* 629 F.Supp. 606, 610–11 (C.D. Ill.1986).

The district court's judgment dismissing plaintiff's complaint is reversed, and this case is remanded for further proceedings consistent with this opinion.[9]

---

9. Plaintiff also asks us on appeal to allow her to amend her complaint to correct pleading defects in her conspiracy claim under 42 U.S.C. § 1985(3) and to add a newly discovered equal protection claim based on the fact that she has recently learned that hormone supplements have been made available to other similarly situated Indiana prisoners suffering from gender dysphoria. Because we are reversing and remanding, the district court is in a better position to rule on these requests.