William SMALL, Plaintiff,

v.

Ray WEEKLY, et al., Defendants.

Civ. A. No. 88–S–1852.

United States District Court,
D. Colorado.

Oct. 22, 1990.

Dennis Hartley, Colo Springs, Colo., Philip Dubois, Boulder, Colo., for plaintiff.

Larry Tannenbaum, James Humes, Denver, Colo., for defendants.

## ORDER

SPARR, District Judge.

THIS MATTER comes on for hearing on Defendants' Motion for Summary Judgment on Plaintiff's First Claim for Relief. The record reflects the Plaintiff tendered his Second Amended Complaint in response to Defendants' original Motion to Dismiss. On February 27, 1989, this Court, by Judge Richard P. Matsch, granted Plaintiff leave to file his Second Amended Complaint and in the same order dismissed Plaintiff's Second and Third Claims for Relief leaving for consideration Plaintiff's First Claim for Relief.

## THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On March 1, 1990, Defendants filed a Motion for Summary Judgment with supporting affidavits alleging that the Plaintiff has no valid claim against the Defendants in his First Claim for Relief pursuant to 42 U.S.C. § 1983 under either the Eighth or Fourteenth Amendment of the United States Constitution. The motion asserts that: (1) the Defendants are not persons for purposes of awarding damages under § 1983; (2) the Defendants were acting in their official capacity and as such the Eleventh Amendment of the United States Constitution bars Plaintiff's claim as asserted; (3) Defendants are entitled to qualified immunity; and (4) that there are no genuine issues of material fact remaining for determination, and the Defendants are accord-

ingly entitled to judgment in the case as a matter of law.

FACTUAL BACKGROUND

Plaintiff was sentenced to the custody of the Department of Corrections of the State of Colorado and was serving his sentence at the Centennial Correctional Facility, Canon City, Colorado. All of the Defendants were employed by the Colorado Department of Corrections and were on duty in the Centennial complex on the 2:00 to 10:00 p.m. shift on November 20, 1986. The Defendants were assigned to B–Block where Mr. Small was confined in Pod B–2. The pod consisted of two tiers of cells and an open area or dayroom.

*1. The Stabbing Incident*

The inmates were allowed to go out of their cells and at the time of the incident forming the basis of Plaintiff's complaint, the Plaintiff, Mr. Small, was out of his cell as were several other inmates including an inmate named Anthony Jones. The inmates were in the dayroom of Pod B–2 at the time of the incident. At about 5:00 p.m., Jones and the Plaintiff were seated at a table where they had just completed their evening meal. According to the affidavit of the Plaintiff, a discussion followed which turned into an altercation between the Plaintiff and the inmate Jones. The Plaintiff alleges that he left the table and was in the process of attempting to return to his cell when he was stabbed by Jones. Immediately following the stabbing, a chase ensued, at which time the Plaintiff attempted to get through to the exit door of the Pod. However, the door was not open. The Plaintiff could see Officers Weekly and Everingham, two of the Defendants, near the door looking into the Pod. The Plaintiff also observed Officer Juliano, the third Defendant, in the control cage above the unit looking into Pod B–2.

The Plaintiff alleges that a two- to three-minute chase followed at which time he was stabbed once or twice more by inmate Jones. In his affidavit, he makes a conclusory allegation that the officers acted with deliberate indifference to his safety in taking no immediate preventive action. In a deposition taken under oath prior to the summary judgment hearing on November 21, 1989. Plaintiff concedes that he did not recall seeing Sergeant Everingham at any time prior to when he apparently observed him during the incident. He admits the same situation existed with respect to Officer Weekly. Plaintiff further admits in his deposition that there were discussions between himself and inmate Jones immediately proceeding the stabbing incident but concedes that there was no commotion or cries for assistance during this time. In addition, plaintiff further concedes that although he was previously aware of a potential problem with inmate Jones, he had made no report of that to any of the Defendants.

After the discussion with inmate Jones, the Plaintiff observed him pull out and display a homemade knife. He alleges that at this point in time, Defendant Juliano was looking into the Pod and should have been able to see the knife. At this time, the Plaintiff attempted to signal Officer Juliano that he wished to return to his cell. Plaintiff speculates that it looked like Officer Juliano was about to open his cell door to let him in when Jones ran up and stabbed him. At this point in time, the Plaintiff ran down the stairs of the tiers and yelled as he ran. During this sequence of events, he remembers seeing Juliano observing him. He ran up to the door hoping that the door would open. Then he ran around in a circle attempting to elude inmate Jones who was swinging the knife at him. During the altercation, the Plaintiff was stabbed a total of four times.

*2. The Disputed Length of Time of the Altercation*

In his deposition, the Plaintiff alleges it was approximately four minutes from the time he was first stabbed until he was removed from the Pod. He claims that it took four minutes to run three times around the inside of the pod before the door opened. In his later affidavit, Plaintiff alleges that the chase took two to three minutes. Defendant Juliano remained in the control booth during the entire incident,

Defendants Everingham and Weekly remained on the lower level outside the door to the Pod.

With respect to Plaintiff's allegation that the Defendants acted with "deliberate indifference and knowingly and in a wanton and reckless disregard of the rights and feelings of the Plaintiff," Mr. Small makes the following comments in response to questions at his deposition (page 137, line 14):

Q Now, you've also indicated each of these defendants acted with direct indifference. In what manner was Weekly directly indifferent to you and your safety?

A (Mr. Small) Well, this is just speculation, but I don't think he was in the pod when the whole thing went down. When he wasn't there, he could have been in the unit, but I know it's unusual. I don't think he was in the unit.

Q So are you saying he was not to your knowledge directly indifferent to your—your rights and your safety?

A I don't understand what you mean by—

Q How about Everingham? In what manner was he indifferent to your safety?

A I don't know what you mean by "indifferent."

Q In what manner did Everingham or Weekly somehow violate your rights?

A My right for protection. That's a high-risk unit.

Q Well, what was it that they did or didn't do?

A They didn't take the provisions of securing that unit.

Q And what time are you saying that the unit should have been secured?

A From the first time they heard the yell. The whole thing could have been prevented. It could have been avoided. The first time. I should—I should— the first—what—I shouldn't have even had the first stab. But really, even after I had the first wound, the first stab, I shouldn't have sustained four stab wounds.

Q How could you—how could the first stab wound have been avoided?

A If he opened the door, it would have stopped.

Q Well, how did they know to open the door?

A He heard me yelling.

Q I thought you yelled after you were stabbed.

A Yeah. This was the first time.

Q How could the first stab have been avoided? How could any of these defendants have acted in a manner that would have caused you not to have been stabbed the first time?

A I'm sure they done it a lot of other times.

.　　.　　.　　.　　.

A ... If they had been watching inside the pod, it wouldn't have—never would have happened.

Q Well, who are you saying should have looked inside the pod?

A Whoever it was that the—the floor supervisor that day.

Q And what knowledge do you have that nobody looked inside the pod?

A I don't. Maybe he did.

.　　.　　.　　.　　.

Q So you sued those persons who worked the unit. Is that basically what happened here?

A Yeah.

Q And you think since they worked the unit, they should have seen this occurring?

A Yes.

### 3. The Jones Deposition

In the deposition taken of inmate Jones, he confirms substantially the facts of the altercation between himself and Mr. Small. However, he states that he took the knife away from Mr. Small during a struggle right after dinner. He states that from the time he grabbed the knife from Mr. Small until they opened the door and started pulling Mr. Small out, the elapsed time was about three minutes. He also remembers that while he was chasing Mr. Small, an officer at the door hollered for him to stop

and opened the top part of the door opening into the pod. In the same deposition, Mr. Jones, upon being asked about his impressions of the guards handling of the situation, states that "they was there so quick, they was there real fast."

Defendants' version of the incident does not differ substantially with that of the Plaintiff, Mr. Small. However, their version does expand somewhat on what was occurring inside the control room based upon facts which were known only to the officers. Defendant Juliano indicates that prior to this incident, he was unaware of any personal problem or animosity between Plaintiff and Anthony Jones. He also confirms the testimony of Mr. Small that he had not been made aware of threats nor advised by any individual that there was any concern for Mr. Small's safety or that his life was in danger in anyway. He states that had he had such information, he would have immediately notified appropriate officials who could have taken action to protect Mr. Small.

### 4. The Juliano Deposition

Officer Juliano testifies in his affidavit that at about 5:00 p.m. on the evening in question, he was seated behind the panel in the control room observing the activity in all three pods of B–Block. He was not in a position to observe Mr. Jones and Mr. Small and therefore got up and walked around the panel to the control room window from which point he could observe what he refers to as a blind spot in Pod B–2. At that time, he observed Mr. Small and Mr. Jones up against the control wall in the blind spot engaged in a conversation. Nothing at that time appeared to indicate any altercation or problem between the two inmates. He then turned to return to the control panel at which time he heard the outcry from the Plaintiff in Pod B–2. He testified that he stood up and observed Mr. Jones chasing Mr. Small. He instantly yelled that there was a problem in Pod B–2 and immediately called on what was called the "crash line" to the other units notifying of an emergency in B–Block. He opened the cell doors of inmates who were out of their cells so they could immediately return to their cells and be locked in. He states that he did not observe the knife in the possession of either Mr. Small or Mr. Jones. Juliano states that Officer Weekly immediately responded to his call and came to the entrance door of Pod B–2. It was at this point in time that Weekly yelled at Mr. Jones to stop chasing the Plaintiff. Jones did not stop and Weekly ordered Juliano to open the door approximately one foot. At this point in time, Juliano had locked the cells (as was required) of the inmates who had been out of their cells. Since they were all in their cells with the exception of Small and Jones, he complied with the request and opened the entrance door to the Pod one foot. He then observed Weekly grab Mr. Small by the shirt collar and pull him from the Pod. He estimated that approximately forty-five seconds lapsed between the time when he first observed Mr. Jones chasing Mr. Small and the time when the Plaintiff was pulled from the Pod by Officer Weekly. At that point in time, approximately five other guards arrived at B–Block to render assistance but by that time the incident had concluded.

### 5. The Everingham Deposition

Defendant Everingham's affidavit confirms that he was on assignment as a floor officer which includes feeding the inmates, distributing and receiving mail, counting inmates, and like duties. His duties also included maintenance of discipline in the cell block. If there was a security problem, the officers are instructed to seek help from security and other units. Defendant Everingham, in his affidavit, confirms that he, like Defendant Juliano, was totally unaware of any personal problems or animosity between inmates Small and Jones and that he observed nothing during the shift prior to the incident in question to indicate any problem existed on that day between the two individuals. Just prior to 5:00 p.m., Officer Weekly and Officer Everingham proceeded in the office outside the door of Pod B–2. They were preparing to eat their dinner, which took place customarily after they had concluded dinner delivery to the inmates. Defendant Evering-

ham heard someone in Pod B–2 yell and at approximately the same time heard Officer Juliano yell from the control room above that there was a problem in Pod B–2. He testifies that Officer Weekly immediately exited the office through the door and proceeded to Pod B–2. He proceeded to obtain the baton launcher kept in the office in B–Block. A baton launcher is a non-lethal device used to control riots and it is required that upon entering a pod, one of the staff members must be in the possession of a baton launcher. Defendant Everingham stated that since he could not tell what was occurring and was uncertain as to whether Officer Weekly would have to enter the pod with him, he determined it appropriate to obtain a baton launcher in case he had to enter the pod. He proceeded immediately to the hallway outside the office and observed Officer Weekly as he pulled the Plaintiff through the partially opened door to Pod B–2. At about this time, Everingham confirms that staff from other units arrived to assist them. Officer Juliano states that the policy of the correctional facility is that in the event of any altercation, they are under no circumstances to open the door to the pod until all inmates, save those involved in the altercation, are locked into their cells. Operational Procedure 029 attached to the affidavits as an exhibit confirms that no fewer than three staff members are to enter the pod at any time to ascertain whether an inmate is locked up and then only when a baton launcher accompanies the staff members. This procedure further confirms the allegation by Officer Juliano that staff members are prohibited from entering Wing B–2 until all inmates have been secured in their cells and if any inmate refuses to lockup, sufficient staff must be summoned to lock up the inmate before anyone enters the pod. These regulations were in full force and effect at the time of this incident.

## THE APPLICABLE STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that judgment "... shall be rendered forthwith if the pleadings, depositions, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The rule further provides "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegation or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

In a trilogy of cases, the United States Supreme Court has recently set down standards for consideration of summary judgments. Justice Powell in *Matsushita Electric Industrial Company Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) emphasizes that in the face of a summary judgment, the non-movant must come forward with specific facts showing a genuine issue for trial. Justice White in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) gives a thorough discussion of the Court's position on what constitutes "genuine issues of material fact" precluding the entry of summary judgment.

Justice White states at 247–249, 106 S.Ct. at 2509–2511:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. [Emphasis in original.]

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

. . . . .

... [s]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Justice White continues:

... in the face of the defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint.'

... there is no issue for trial unless there is a sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–289 [88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569] (1968).

■ It is incumbent upon the trial judge to grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law. The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. The standard enunciated by Justice White in his words mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a) which dictates that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, quoting *Brady v. Southern R. Co.*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943). It has long been the law that judges are not required to submit a question to the jury merely because some evidence has been introduced by the party bearing a burden of proof. Such issues need only be submitted where the evidence is sufficient as to warrant the jury finding a verdict in favor of the party in question. This mandate requires more than a scintilla of evidence but rather an inquiry by the court before submitting matters to juries as to whether there is sufficiency of evidence upon which a jury could properly proceed to find a verdict for the party bearing the burden of proof. *Improvement Co. v. Munson*, 14 Wall. 442, 448, 20 L.Ed. 867 (1872), quoted with approval, *Anderson v. Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. at 2511–12.

After his discussion with respect to the definition of the element of materiality, in the *Anderson v. Liberty Lobby* test Justice White comes to the more important issue that summary judgment will not lie if the dispute about the material fact is "genuine." That is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Again quoting from *First National Bank of Arizona v. Cities Service*, 391 U.S. at 288–289, 88 S.Ct. at 1592–1593, Justice White observed that "it is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence. Rather, what is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. at 248–249, 106 S.Ct. at 2510–2511.

■ It was made clear that a Plaintiff may not rest on mere allegations to get a question to a jury without *significant probative evidence* tending to support the complaint. (Emphasis added.) *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11, citing *First National Bank of Arizona v. Cities Service*, 391 U.S. at 290, 88 S.Ct. at 1593. Finally, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), it was made clear that in the absence of a showing of every ele-

ment essential to the party's case, summary judgment may enter. There can be no genuine issue as to any material fact on a failure of proof concerning an essential element of the nonmoving party's case. In such situation all other facts are deemed immaterial and the moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing of an element with respect to which he bears the burden of proof.

■ Justice Rehnquist observed in *Celotex*, that one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses and the court expresses the opinion that the rules should be interpreted in a way which allows it to accomplish that purpose. Standing alone, the pleading of an essential element is insufficient in the face of a summary judgment. *Id.* at 323, 106 S.Ct. at 2552–53.

■ Rule 56 requires the nonmoving party to go beyond the pleadings by affidavit, deposition, answer to interrogatories, or other method and designate specific facts to show that there is a genuine issue for trial.

### THE ISSUES BEFORE THE COURT ON THIS SUMMARY JUDGMENT MOTION

It is in light of the standards referred to above that the Court considers the motion now before it on two basic grounds. First, whether the Plaintiff presented sufficient issues for trial as to whether he is entitled to relief for a claim other than common law negligence (a claim which has been dismissed and is not appropriately recognized here); that is, for a violation of his civil rights under 42 U.S.C. § 1983. Second, assuming for purposes of argument that a claim under 42 U.S.C. § 1983 exists, are the Defendants entitled to qualified immunity for acts performed in their official capacity? The Court shall address the above issues in reverse order.

*1. The Immunity Issue*

At its theoretical core, the resolution of immunity questions requires a balance between the inevitable evils of either extreme. Where there is an allegation of abuse of an official office, individuals have a right to recover for vindication of their constitutional guarantees. Congress has recognized and enshrined such rights in 42 U.S.C. § 1983. At the same time, however, the Supreme Court has noted that it cannot be seriously disputed that such claims frequently are groundless and this gives rise to substantial expenditures of resources not only by officials in positions similar to Defendants herein, but to society as a whole. The social costs include expenses of litigation, diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. There arises also a danger that the fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982), citing *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

In deference to these considerations, the Supreme Court has identified what has come to be known as qualified or good faith immunity as the best attainable accommodation of the competing values. The basic assumption in qualified immunity is that it allows unsubstantiated lawsuits to be quickly determined and terminated without the necessity of protracted litigation involving discovery, pre-trial motions, and trial. The primary means of accomplishing this is through the use of summary judgment. Decisions of the Supreme Court have established that qualified immunity has both an objective and subjective aspect. The objective element involves a presumptive knowledge of and respect for basic unquestioned constitutional rights. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975). The subjective element refers to "permissible intentions." Characteristically, the Court has distinguished the two elements by identifying the circumstances in which qualified immunity would not be available. The Su-

preme Court has held that qualified immunity would be defeated if an official *"knew or reasonable should have known* that the action he took within his sphere of his official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury ..." (Emphasis in the original.) *Harlow v. Fitzgerald,* 457 U.S. at 815, 102 S.Ct. at 2737, citing *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975). This test is generally known as the objective test.

### A. Plaintiff's Eighth Amendment Claim

■ In the case at bar, it is abundantly clear that the objective element of the above test is satisfied. Prisoners incarcerated in corrections facilities are clearly entitled to constitutional guarantees against attacks by other inmates. Violation of such rights may rise to the level of an Eighth Amendment violation. *Meriwether v. Faulkner,* 821 F.2d 408, *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987); *Blankenship v. Meachum,* 840 F.2d 741 (10th Cir.1988). It must also, however, be emphasized that "[w]hile an express intent to inflict unnecessary pain is not required, ... [i]t is obduracy and wantonness, not inadvertence or error in good faith that characterize conduct prohibited by the Cruel and Unusual Punishments clause." *Blankenship v. Meachum, id.* at 742, citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

■ The subjective element of qualified immunity is here revisited with regard to the scope of permissible intentions. Qualified immunity is defeated only by a showing that the official "knew or reasonably should have known that his actions violated the constitutional rights of the plaintiff or he took such actions with malicious intention to cause deprivation of plaintiff's constitutional rights." As stated in *Meachum, id.,* inadvertence or error in good faith do not amount to conduct prohibited by the Eighth Amendment. Plaintiff is required

to show obduracy and wantonness or malicious intent on the part of the Defendants to satisfy an Eighth Amendment claim.

### B. Plaintiff's Fourteenth Amendment Claim

■ The due process clause of the Fourteenth Amendment prohibits deprivation of life, liberty, or property without due process of law. This guarantee has been held consistently to require a deliberate decision by a government official. There is no holding that supports the view that mere negligent conduct by a state official, although it results in injury, amounts to a deprivation of due process. Further, there exists no authority to support the notion that the violation of a common law duty constitutes a deprivation protected under the Fourteenth Amendment. Jailers may owe a special duty of care to those in their custody under state tort law, but the contention that the due process clause of the Fourteenth Amendment embraces such tort law has been specifically rejected. The Fourteenth Amendment of the United States Constitution does not afford a remedy for negligently inflicted injury. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Although questions concerning intent such as those embraced in the subjective component of permissible intentions of the qualified immunity test can rarely be decided on summary judgment, a mere allegation of malice does not suffice to subject government officials to trial. *Harlow v. Fitzgerald,* 457 U.S. at 817, 102 S.Ct. at 2737–38.

### 2. Application of the Summary Judgment Standard

■ In light of the standards discussed earlier which apply to this summary judgment, as set forth in the "trilogy" of cases on summary judgment, *Matsushita v. Zenith,* 475 U.S. 574, 106 S.Ct. 1348, *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, this Court concludes that there exists no genuine issue of fact remaining for determination as to whether the Defendants knew or reason-

ably should have known that their actions in the sphere of their official responsibility were violative of Plaintiff's constitutional rights under either the Eighth or Fourteenth Amendments, or that Defendants acted with malicious intention to cause a deprivation of the constitutional rights or other injury. To allow Plaintiff to proceed to trial in this matter in light of the unrefuted facts and based exclusively upon the allegation in his complaint that the Defendants acted with deliberate indifference, knowingly, wantonly, and recklessly disregarded the rights of the Plaintiff would fly directly in the face of the touchstone of *Harlow*, 457 U.S. at 818–819, 102 S.Ct. at 2738–2739. To hold otherwise would convert the rule of qualified immunity into a rule of virtually unqualified liability by allowing the litigation of allegations based on abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. This approach would destroy the balance that the Courts have attempted to strike between the interests in vindicating constitutional rights of citizens and the effective performance by public officials of their duties by making it otherwise impossible for officers to reasonably anticipate when their conduct could give rise to liability for damages. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court therefore concludes here that the doctrine of qualified immunity protects the Defendants from liability they might otherwise incur under the unrefuted factual circumstances of the case at bar.

Based on this conclusion that the defendants can properly invoke qualified immunity, a discussion of the application of *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), is unnecessary.

### A. The Asserted § 1983 Violation

 With respect to the Plaintiff's basic claim of violation of 42 U.S.C. § 1983 by the violation of his rights under the Eighth or Fourteenth Amendment, the Court concludes that notwithstanding the assertion by the Defendants of the affirmative defense of qualified immunity, the Plaintiff has wholly failed to present here any genuine issue of material fact remaining for determination and Defendants are, in accordance with the standards for summary judgment, entitled to a judgment as a matter of law.

To prevail on his claim under 42 U.S.C. § 1983, the Plaintiff must prove a violation of a constitutional right. Depending upon the right involved, mere negligent conduct may not be enough to state a claim. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

### B. Plaintiff's Eighth and Fourteenth Amendment Claims

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) the United States Supreme Court noted that deliberate indifference is required to constitute cruel and unusual punishment under the Eighth Amendment. This standard was also enumerated in *Blankenship v. Meachum*, 840 F.2d at 741, where it was held that obduracy and wantonness, not inadvertence or error in good faith characterized conduct prohibited by the Eighth Amendment.

The Due Process Clause of the United States Constitution was "intended to secure the individual from the arbitrary exercise of the powers of government." *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111, 116–17, 28 L.Ed. 232 (1884). In *Daniels v. Williams*, 474 U.S. at 332, 106 S.Ct. at 665, Justice Rehnquist articulated an important concern for courts to consider when examining the type of claim asserted by the Plaintiff:

The Fourteenth Amendment is a part of a Constitution generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and States, and to secure certain individual rights against both State and Federal Government. When dealing with a claim that such a document creates a right in prisoners to sue a government official because he negligently created an unsafe condition in the prison, we bear in mind Chief Justice Marshall's admonition that,

'we must never forget, that it is *a constitution* we are expounding.' *McCulloch v. Maryland*, 4 Wheat. (17 U.S.) 316, 407 [4 L.Ed. 579] (1819) (emphasis in original).

Mere negligence or lack of due care has been clearly held not to constitute on its face a deprivation of life, liberty, or property protected under the Fourteenth Amendment or cruel or unusual punishment protected under the Eighth Amendment. *Daniels v. Williams*, 474 U.S. at 331, 106 S.Ct. at 665.

Under the state of facts here existing, the Court concludes that the Plaintiff has wholly failed, save in his conclusory pleading and in one conclusory statement in his affidavit, to set forth any material facts upon which to base a claim of deprivation of his constitutional rights by the Defendants here. Accordingly, they are entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that judgment shall be entered in favor of the Defendants Ray Weekly, Carmen Juliano, and Sgt. William Everingham, individually and in their capacity as employees of the Department of Corrections of the State of Colorado, and against the Plaintiff.

It is further ordered that this complaint be dismissed and Defendants shall be awarded their costs and such other and further relief as appropriate in the premises.