**Richard C. LOE, et al., Plaintiffs,**

v.

**Warden WILKINSON, et al., Defendants.**

**Civ. No. 83–1773.**

United States District Court, M.D. Pennsylvania.

Aug. 22, 1984.

Richard C. Loe, pro se.

James W. Walker, Asst. U.S. Atty., Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiff, an inmate incarcerated in the United States Penitentiary System, filed this civil rights action dated December 8, 1983, alleging violations in the conditions of confinement while incarcerated in the [Special Housing Unit (hereafter S.H.U.)] at the United States Penitentiary, Lewisburg, Pennsylvania. The eight defendants in the case include the Warden and various officers at the institution. The complaint alleges that the conditions under which the plaintiff was confined constitute an infliction of cruel and unusual punishment prohibited by the Eighth Amendment and an abridgement of his First Amendment right of freedom of worship. This complaint also includes a request for class certification. By Order dated December 27, 1983, plaintiff was required to file an amended complaint in compliance with Rule 8 of the Federal Rules of Civil Procedure. The amended complaint was filed January 16, 1984. Plaintiff has filed a large number of discovery and other pretrial motions. In order to facilitate disposition of this matter, a pretrial conference was held pursuant to Rule 16 of the Federal Rules of Civil Procedure.[1] During the conference, plaintiff alleged the following constitutional violations existed at the Lewisburg Penitentiary: inadequate heating system, inadequate ventilation, inadequate living space, inadequate lighting and denial of attendance at group worship; in disciplinary segregation specif-

---

**1.** Rule 16 is intended as a flexible device to be adapted to the problems of the particular case. *See* 6 C. Wright & A. Miller, Federal Practice & Procedure, Civil § 1521, at 565–66 (1971). Just as the court may render judgment on immaterial issues and issues for which there is no dispute of material fact, "judgment may be ordered ... if there is no triable issue left at the end of the discussion." *Id.* § 1525, at 592–93. *See Stackhouse v. Marks,* 556 F.Supp. 270 (M.D.Pa. 1982), *aff'd* 707 F.2d 1404 (3d Cir.); *Pifcho v.* *Brewer,* 77 F.R.D. 356 (M.D.Pa.1977). *See also Newman v. Granger,* 141 F.Supp. 37, 39 (W.D. Pa.), *aff'd* per curiam, 239 F.2d 384 (3d Cir. 1957) (agreement on all necessary and relevant facts permits decision on the merits). Prior to the beginning of the discussion plaintiff was reminded that the court had sent him a letter informing him of the potential for elimination of issues or dismissal of the entire case should that course be appropriate at the end of the conference.

ically the denial of personal property for one week and inadequate clothing; in administrative detention specifically the lack of adequate recreational and educational opportunities, limited telephone and television privileges, inadequate access to entertainment and inadequate access to the general library.

■■■ The court will first consider the plaintiff's request for class certification. The plaintiff has the burden of demonstrating that the requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied.[2] The plaintiff has failed to address any of these requirements in his complaint. In addition, in light of the fact that the case will ultimately be dismissed and closed by this Memorandum and Order, the court will deny plaintiff's request for class certification.

■■■ The plaintiff's Eighth Amendment claims relate to conditions of confinement in the S.H.U. at Lewisburg. The Eighth Amendment standards for the S.H.U. are the same as those which apply to inmates housed in general population. Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care and personal safety. *Newman v. State of Alabama*, 559 F.2d 283, 291 (5th Cir.1977), *cert. denied*, 438

U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). *See also Wolfish v. Levi*, 573 F.2d 118 (2d Cir.1978). The test to determine whether an inmate is subjected to cruel and unusual punishment is whether the resulting conditions, alone or in combination, deprive the inmate of the minimized civilized measure of life's necessities as measured under contemporary standards of decency. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In considering the totality of the circumstances, the court must examine all of the circumstances that bear on the nature of the shelter provided. *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 999 (3d Cir.1983) citing *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir.1982).

■■■ The substance of plaintiff's claims concerning the conditions in the S.H.U. was clarified during the course of the pretrial conference. The plaintiff initially contends that the institution's heating and ventilation system is inadequate. The operation of the system was explained during the conference by James Swartz, the building engineer at Lewisburg. While there is no control over the temperature from inside the cell, the temperature is monitored by a unit outside the prison which senses the outside temperature and activates the heat automatically.[3] While this system may not

---

**2.** *See Blumenthal v. Great American Mortgage Investors, et al.,* 74 F.R.D. 508 (N.D.Ga.1976). This means showing, *inter alia,* that all the prerequisites outlined in Rule 23(a) and that one of the prerequisites outlined in Rule 23(b) have been met. Rule 23(a) provides:

> Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Also, a definable class must exist and the representatives must be members of that class. *See* 7 Wright & Miller, Federal Practice and Procedure, Civil § 1759, p. 573 (1972).

**3.** Testimony at the conference indicated:

> MR. SWARTZ: There is an automatic control ... that is called a weatherstat that senses

outdoor conditions and will turn the steam on and off as it gets cold or hot.

> THE COURT: Would that be for all three floors?

> MR. SWARTZ: Yes....

> MR. LOE: But can like the heat remain on, can staff like leave the heat on irregardless of what the sensor—sensor says?

> THE COURT: I imagine you can switch it from automatic or manual; can't you or can you?

> MR. SWARTZ: No, there's a valve in the basement of the building, the steam valve, automatic valve, that is called a regulator opening and closing. There is no way to keep the valve open if the regulator wants to close it....

> THE COURT: The weatherstat, does it have a degree control, a thermostat control?

> MR. SWARTZ: Yes.

> THE COURT: And what would that be?

> MR. SWARTZ: I really couldn't say offhand.

> MR. LOE: I don't see how. There is no thermostat inside the building that I know of.

be the most desirable system, considering all of the proposed testimony produced at the conference, the court finds the heating system to be adequate. It may be more desirable for the inmate to have a system which provides individual temperature controls, however, the failure to provide such is not a constitutional violation.

■ Similarly, the operation of the ventilation system was discussed and explained at the pretrial conference. The plaintiff concedes that there are approximately fifty small holes in the cell walls in addition to a window and openings in and around the door which allow for an exchange of air. According to Mr. Swartz, the holes and other openings constitute a "natural" ventilation system, whereby the air passes to the chimney pulling air from other openings in a modified suction motion.[4] In addition, he asserted the screened box apparatus attached to the window for security purposes does not dissipate the amount of air entering the cell to any great extent. While the S.H.U. may not contain the same ventilation system as exists in general population, it is sufficient for Eighth Amendment purposes. The court has no doubt that humidity and temperatures are high in the hot summer months. This alone, however, or in combination with other conditions existing in the S.H.U., does not offend contemporary standards of decency.

■ The plaintiff also contends that the amount of light existing in the S.H.U. is inadequate. As the pretrial transcript reveals, there is one bare bulb in each cell, generally 100 to 150 watts. Transcript at 68–69. In addition, the cell ceilings are painted white to allow reflecting light. Plaintiff asserts that while the lighting may be adequate for the inmate on the top bunk it is inadequate for the inmate on the lower bunk. In the S.H.U., since there are generally no chairs provided, as distinguished from general population, the bunks are the only place to sit and read. If the entire cell provided a dark, dungeon type atmosphere, the court might be inclined to agree with the plaintiff's contentions. However, in light of the fact that plaintiff concedes the inmate on the top bunk receives adequate lighting, and the white ceilings would reflect the light throughout the cell, the court finds no constitutional violation present. The Constitution does not mandate comfortable prisons, and prisons

MR. SWARTZ: It's not based on indoor temperature. It's based solely on outdoor conditions....
THE COURT: Well, would it ever get to 85 degrees or something like that?
MR. SWARTZ: Inside the—
THE COURT: Yes.
MR. SWARTZ: It's possible it could.
MR. WALKER: And along those lines, Your Honor, if the temperature in the particular cell, let's say, reached a degree of 85 degrees, what means could an inmate take to lower the temperature if it hadn't automatically shut down?
THE COURT: So he can open the window, can't he?
MR. SWARTZ: The means available, he can open the window, yes. The window does have a screen on it, but it still allows 40% of open area, so it's roughly two square feet of free air to enter through the window.
MR. LOE: I'd like to point out that the screen is removed from the window by approximately a foot and a half. It's like a black box surrounding the window....
MR. WALKER: Is there any reason why that would reduce the flow of air into the window?
MR. SWARTZ: If the wind direction was along the side of the building it would proba-

bly have some effect, in that you wouldn't have the suction created by passing directly by the window opening. But, no, not to any great extent.
Transcript of pretrial conference, Document No. 37 of the Record at 45–49.

4. At the conference Mr. Swartz stated:
The holes in the wall that he was referring to allow air to pass into a pipe chase or a chimney-type affair that aids in circulation of the air inside the cell. No air comes out of the hold, the air goes into those holes and up like a chimney into the attic and then it's dispersed into the atmosphere on the basis that hot air will rise.
When the hot air starts to rise through that chimney, it pulls air into any available opening, which would be the outside window, the two-inch under cut under the door, or the cracks around the door, which does not seal air tight. And so basically the ventilation is natural ventilation based on dynamic rules, so there is no mechanical ventilation in the building.
*Id.* at 43–44.

which house persons convicted of serious crimes cannot be free from discomfort. *Rhodes v. Chapman, supra,* 452 U.S. at 349, 101 S.Ct. at 2400. As long as the conditions within the cell meet Eighth Amendment standards, no constitutional violation is present. Therefore, the Court has determined the allegations concerning the physical conditions do not either singly, or in combination, approach constitutional inadequacy.

■ The plaintiff next contends that the policy of denying S.H.U. inmates participation in group worship contravenes his right to worship as guaranteed by the First Amendment. In *Bell v. Wolfish,* 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979), the Supreme Court noted that prisoners do not lose all constitutional protection by reason of conviction and confinement. However, prisoners' rights are subject to restrictions and limitations and that "even when an institutional restriction infringes a specific guarantee, such as the First Amendment, the practice must be evaluated in light of the central objective of prison administration, safeguarding prison security." *Id.* at 547, 99 S.Ct. at 1878 (citing *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), *Pell v. Pecunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *St. Claire v. Cuyler,* 634 F.2d 109, 114 (3d Cir.1980), the court determined that a "reasonable justification" concept for such a prison practice is not appropriate when evaluating a restriction of a constitutional right. It explained "[r]easonableness' imposed too rigid a burden on prison authorities ... [t]he state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security."

At the pretrial conference, it was explained plaintiff was initially confined in the S.H.U. pending investigation of a variety of disciplinary charges, including assault on a staff member. The remainder of his time there was in response to conviction on those charges. The court can think of no more serious threat to prison security than an assault on the prison staff. Prison officials must be able to detain prisoners pending investigation of serious charges which threaten the internal stability of the institution. Conditions encountered during detention were a direct response to the increased security threat posed by the inmate awaiting a hearing before the prison's disciplinary committee. The court cannot say that a policy of preventing potentially explosive inmates from mixing with the general population at a group worship service is not a policy without justification.

The court must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence ... that the officials have exaggerated their response" to security considerations or the officials beliefs are unreasonable. *Id.* at 115 (citing *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 and *Jones, supra,* 433 U.S. at 128, 97 S.Ct. at 2539). The discussion at the pretrial conference demonstrated the propriety of the prison officials' actions and that it was not exaggerated under the circumstances. Accordingly, plaintiff's First Amendment claim will be dismissed.

■ Additionally, the plaintiff complains that he was required to share his cell with another inmate. The Special Housing Unit at the prison is utilized for the confinement of inmates awaiting disciplinary hearings, inmates actually being punished, inmates there for security reasons and inmates anticipating transfer to another institution. The cell-sharing here was obviously necessitated by the volume of the prisoners confined in the Unit and is "justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). In *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877, Justice Rehnquist emphasized: "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional

rights of both convicted prisoners and pretrial detainees. Central to all other correction goals is the institutional consideration of internal security within the corrections facilities themselves. *Pell v. Procunier,* *supra,* [417 U.S. at 823, 94 S.Ct. at 2804]; *see Jones v. North Carolina Prisoners Labor Union, supra,* [433 U.S. at 129, 97 S.Ct. at 2539]; *Procunier v. Martinez,* 416 U.S. 396, 412 [94 S.Ct. 1800, 1811, 40 L.Ed.2d 224] (1974)."

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59, the Supreme Court held that, in and of itself, double celling is not unconstitutional. Prisoners spend most of the day in their cells. The amount of living space which is ideal for one inmate is not always attainable in the real world of prison administration. One cannot expect prison officials to anticipate the number of prisoners who will need to be separated from other inmates and still insure that each prisoner receives his own cell. "There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolf v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935.

In the case *sub judice,* as in *Rhodes,* the double-celling did not lead to deprivations of medical care, food or sanitation. There was no allegation of increased violence as a result of double-celling. The court has determined the cell in the Unit have adequate heating, ventilation and lighting. Therefore, plaintiff's claim of a constitutional violation due to double-celling will be dismissed.

■ With respect to the plaintiff's stay in disciplinary segregation, he asserts the denial of his personal property and the necessity to wear cloth slippers as Eighth Amendment violations. He claims he was denied his personal property for approximately one week. This was explained at the conference as the time necessary to remove the property from plaintiff's cell in general population, inventory it and have it transferred to the S.H.U. Prison officials also stated plaintiff was given whatever hygienic products he needed to maintain himself while his property was being transferred.

Inmates in disciplinary segregation are not permitted to wear their own shoes, but are given cloth slippers with rubber soles to be worn during confinement. The denial of their own shoes, prison officials explained at the conference, is attributed to the frequency of prisoners using their shoes as an object to throw at prison staff members. Since plaintiff was given shoes, although not the ones he would have liked during his confinement in disciplinary segregation, the court finds no constitutional violation.

■ Finally, the plaintiff alleges the conditions in administrative detention constituted cruel and unusual punishment due to the lack of recreation and educational opportunities, diminished telephone and television privileges and inadequate access to entertainment and the general library. The plaintiff does not allege that he is denied the opportunity for recreation. Under prison policy, he is allowed one hour of exercise a day, five days a week. He contends that this amount of exercise is insufficient.

It is true that inmates need regular exercise to maintain reasonably good physical and psychological health. *See Dorrough v. Hogan,* 563 F.2d 1259 (5th Cir.1977), *Frazier v. Ward,* 426 F.Supp. 1354, 1367–69 (N.D.N.Y.1977), *Pugh v. Locke,* 406 F.Supp. 318, 332 (M.D.Ala.1976), *Osborn v. Manson,* 359 F.Supp. 1107 (D.Conn.1973). In *Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979), the court found that where prisoners were confined for a period of years, prison officials must provide one hour of outdoor exercise five days a week, unless inclement weather, unusual circumstances or disciplinary needs made that impossible. This court also finds that one hour of exercise, five days a week is sufficient where all other conditions in the unit are adequate, as was shown here.

With regard to educational opportunities, and the balance of the plaintiff's claims

concerning administrative detention, it is true that some opportunities and privileges given to members of the general population are not afforded inmates confined in the S.H.U. However, if the prisoner is furnished with reasonably adequate basic necessities (*e.g.* food, clothing, shelter, sanitation, medical care and personal safety), so as to avoid the imposition of cruel and unusual punishment, prison official's obligations under the Eighth Amendment are satisfied. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity a prisoner may think is needed to avoid mental, physical or emotional distress. *Newman, supra,* at 291. The plaintiff was afforded the basic human needs required by the Eighth Amendment. The court finds that the restrictions the plaintiff had to endure during his stay in administrative detention—lack of educational programs, diminished access to the general library, denial of participation in group entertainment programs, limited use of the telephone—were a necessary part of prison security and do not amount to an infliction of cruel and unusual punishment.

Therefore, the plaintiff's claims will be denied and his complaint dismissed.

An appropriate Order will enter.