**Douglas C. FARMER**

v.

**Norman CARLSON, et al.**

**Civ. No. 87-0215.**

United States District Court, M.D. Pennsylvania.

Feb. 29, 1988.

Douglas Farmer, Oxford, Wis., for plaintiff.

Timothy B. Haney, Asst. U.S. Atty., Harrisburg, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Currently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, the court will grant defendants' motion and dismiss this case.

### Background[1]

Plaintiff was an inmate at U.S.P.—Lewisburg, PA from November 7, 1986 until March 17, 1987 when he was transferred to F.C.I.—Petersburg, VA. A twenty-one (21) year old diagnosed transsexual, plaintiff spent his entire stay in Lewisburg in administrative detention. Plaintiff filed the instant civil rights action[2] on February 11, 1987. *See* document 1 of record. In his amended complaint, *see* document 21 of record, plaintiff names the following individuals as defendants: Norman A. Carlson, Administrator of the Bureau of Prisons (BOP); David R. Essig, Regional Director of the Northeast Region of the BOP; C.R. Edwards and J.J. Clark, Wardens at U.S.P. —Lewisburg and F.C.I.—Petersburg, respectively; and four John Doe defendants, correctional staff and employees at the two prisons. *See* document 21 of record, Amended Complaint, paras. 4–8.

As stated previously, plaintiff arrived at U.S.P.—Lewisburg on November 7, 1986. From the medical records submitted by the parties, it appears that plaintiff suffers from dysthymic disorder and transsexualism. *See* documents 25 of record, Attachments, Medical Summary; 44 of record, Exhibits A–10, A–13. Plaintiff's Lewisburg Medical Summary, for example, reads as follows:

> Douglas Farmer arrived at the United States Penitentiary, Lewisburg, Pennsylvania on November 7, 1986. Review of the medical record provided during this time (November 7, 1986 through March 17, 1987), reveals three medical problems. These problems include the issue of estrogen treatment for transsexualism, the issue of psychiatric evaluation for the diagnosis of depression, and thirdly, his possible exposure to syphilis. Mr. Farmer was seen by Dr. Paolo DePetrillo, board certified in internal medicine, at the request of the Health System Administrator, Mr. Edward Gawrysiak, on November 12, 1986. During this interview, the inmate denied exposure to homosexual activity or intravenous drug abuse and had not experienced fever, chills or night sweats or other constitutional symptoms which would suggest an acute or chronic medical illness. Further, the history at that time revealed his last dose of Premarin, which is the conjugated estrogen, had been one month earlier.
>
> The pertinent physical examination findings include some decrease in facial hair, rearrangement of body fat to a female distribution. It can be noted that there was no gynecomastia, which is an excessive development of male breast tissue. The second examination was prompted because the initial examination revealed an absent scrotal sac. The medical report from MCFP, Springfield did indicate that the inmate had testicles bilaterally.

---

1. For the complete procedural history of this action, see document 42 of record (Memorandum and Order of October 30, 1987).

2. Plaintiff originally styled this action as a petition for writ of habeas corpus. *See* document 1 of record. By Order dated February 27, 1987, the court construed this case as containing only a civil rights action. *See* document 5 of record.

Dr. DePetrillo's second examination did reveal the testicles. It is documented in the medical record that future genitalia examinations should include careful assessment of the inguinal canal, should the testicles not be apparent.

*See* document 25 of record, Attachments, Medical Summary.

In the instant civil rights action, plaintiff asserts various claims regarding his four and one-half month stay in administrative segregation at Lewisburg. Plaintiff claims that: (1) defendants denied him the assistance of a "jailhouse lawyer" while he was in administrative segregation, thereby denying him his sixth amendment right of access to the courts; (2) defendants were deliberately indifferent to plaintiff's serious medical condition in that they did not afford him psychiatric treatment and refused to continue his estrogen treatment; and (3) he was subjected to cruel and unusual punishment, and his rights to due process and equal protection were violated, as a result of his placement in administrative segregation. These claims will be discussed *in seriatim.* Preliminarily, however, the court must address defendants' claim that venue is improper in this district as to any act or omission that occurred at F.C.I.—Petersburg, and that the complaint fails to allege that any of defendants Carlson, Essig, Edwards, and Clark personally participated or acquiesced in any alleged constitutional violation.

*Respondeat Superior and Venue.*

"Claims brought under Section 1331 and *Bivens* are the federal counterpart to Section 1983 civil rights complaints. As such, collateral issues developed under Section 1983 should apply to these claims by analogy." *Paton v. LaPrade,* 524 F.2d 862, 871 (3d Cir.1975); *Rende v. Rizzo,* 418 F.Supp. 96, 98 (E.D.Pa.1976). One such collateral issue involves the doctrine of *respondeat superior.*

■ The Third Circuit has rejected the theory of *respondeat superior* in actions under section 1983. *Hampton v. Holmes-*

*burg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976); *Dyson v. Kocik,* 564 F.Supp. 109, 120 (M.D.Pa.1983) (Rambo, J.), *aff'd,* 740 F.2d 956 (3d Cir.1984). Instead, there must be acquiescence or participation in the violation before liability attaches under section 1983. *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976). The same standard applies in a *Bivens* action involving a federal prisoner. *Rende v. Rizzo, supra.*

■ Contrary to defendants' contention, plaintiff does not seek to hold defendants Carlson, Essig, Edwards, and Clark liable solely on the theory of *respondeat superior.* As stated by plaintiff,

[in] the case at bar the warden certainly knew of the plaintiff's alleged unconstitutional violations, well as acquiesced and participated in the denial. Specifically defendants had knowledge and participated in the denial of plaintiff's alleged constitutional violations. Defendants signed administrative remedies, denying plaintiff's constitutional rights. And with out [sic] their signature the alleged violations could not have continued.

*See* document 44 of record. These facts are sufficient to satisfy the personal involvement requirement. *See Dyson v. Kocik,* 564 F.Supp. at 120 (conduct of superintendent of correctional institution in reviewing misconduct proceedings in which prisoner's due process rights were allegedly violated was sufficient to satisfy personal involvement requirement for civil rights action).

■ As to venue regarding any act or omission that occurred at F.C.I.—Petersburg, VA, it is clearly improper in this district. When jurisdiction is not founded solely on diversity, venue is proper only in the district where all defendants reside, or in which the claim arose. *See* 28 U.S.C. section 1391(b). Here, all the defendants do not reside in this district, and any claims regarding plaintiff's incarceration at F.C.I. —Petersburg arose in Virginia.[3] Thus, venue is improper in this district with re-

---

**3.** 28 U.S.C. section 1391(e) provides that a civil action in which a defendant is an officer or employee of the United States acting in his official capacity or under color of legal authority may be. brought in any judicial district in which a defendant in the action resides. This provision, however, does not apply to actions for money damages brought against federal offi-

spect to the claims or the defendants related to F.C.I.—Petersburg.[4]

Turning to plaintiff's substantive claims regarding his incarceration at U.S.P.—Lewisburg, the court finds them to be meritless. Summary judgment will therefore be granted in favor of defendants.

*Discussion*

When examining a motion for summary judgment, the court must view all facts in the light most favorable to the party opposing the motion. *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 404 (3d Cir.1981). If there exists a genuine issue as to any material fact, summary judgment must be denied. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* section 2725, at pp. 93–95 (1983). In addition, summary judgment will not lie if the dispute about a material fact is "genuine," that is, "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In opposing a motion for summary judgment, a party must present evidentiary affidavits or risk having the undisputed statements contained in the movant's affidavits taken as true." *See* Fed.R.Civ.P. 56(c); *see also Sierra v. Lehigh County Pennsylvania,* 617 F.Supp. 427, 429 (E.D. Pa.1985).

*Medical Care*

█ In order to state a cognizable claim for improper medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving stan-

dards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). This standard thus requires both deliberate indifference on the part of prison officials and that the medical needs be serious. *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1978). A "serious" medical need may fairly be regarded as one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Pace v. Fauver,* 479 F.Supp. 456, 458 (D.N. J.1979), *aff'd,* 649 F.2d 860 (3d Cir.1981); *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977).

Even though plaintiff and defendants have a differing opinion as to the proper treatment to be received by plaintiff, this does not in and of itself state a constitutional violation. *Lamb v. Maschner,* 633 F.Supp. 351, 353 (D.Kan.1986); *see also Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977). As stated by the court in *Bowring,*

> we disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment. The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion ... For a constitutional tort to arise and for a cause of action to be stated under section 1983, the complainant must allege deliberate indifference to his continued health and well-being.

551 F.2d at 48. Thus, "the key question ... is whether defendants have provided plaintiff with some type of treatment, regardless of whether it is what plaintiff desires." *Lamb v. Maschner,* 633 F.Supp. at 353.

As stated previously, plaintiff suffers from dysthymic disorder and transsexualism.[5] His claim regarding improper medi-

---

cials in their individual capacities. *See Micklus v. Carlson,* 632 F.2d 227, 240–241 (3d Cir.1980).

4. Plaintiff does not contest this conclusion. Instead, he merely argues that venue is properly claimed as to any acts or omissions that occurred at U.S.P.—Lewisburg, and that the action should not be dismissed for that reason. *See* document 44 of record.

5. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders explains dysthymic disorder in the following manner:

> The essential feature is a chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities and pastimes, and associated symptoms, but not of sufficient severity

cal treatment has two elements: (1) that defendants were indifferent to his serious medical condition by denying him conjugated estrogens or Premarin, *see* document 21 of record, Amended Complaint, Second Additional Cause of Action; and (2) that he was denied adequate psychiatric treatment. These elements will be examined in turn.

■ Defendants do not contest that plaintiff was denied the medication Premarin, a brand of conjugated estrogens. The denial, however, did not stem from a deliberate indifference to plaintiff's medical needs, but instead resulted from an informed medical opinion. *See* document 25 of record, Certification of James McPherson, Attachment A (Medical Summary). As there stated by Drs. Krones, DePetrillo, and Williamson,

> [e]strogen treatment for the putative diagnosis of transsexualism is a form of drug therapy. Before the institution of drug therapy, a decision must be made by the physician and patient as to the risks and benefits of such therapy. The types of drugs and the duration of therapy are chosen so as to maximize the benefits and minimize the risks to the patient.

> and duration to meet the criteria for a major depressive episode (full affective syndrome).
>
> For adults, two years' duration is required; for children and adolescents, one year is sufficient.
>
> The depressed mood may be characterized by the individual as feeling sad, blue, down in the dumps, or low. The depressed mood of loss of interest or pleasure may be either relatively persistent or intermittent and separated by periods of normal mood, interest, and pleasure. These normal periods may last a few days to a few weeks. The diagnosis should not be made if an apparently chronic course has been interrupted by a period of normal mood lasting more than a few months.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 220–221 (3d ed. 1980). In turn, the Manual explains transsexualism as follows:

> The essential features of this heterogeneous disorder are a persistent sense of discomfort and inappropriateness about one's anatomic sex and a persistent wish to be rid of one's genitals and to live as a member of the other sex. The diagnosis is made only if the disturbance has been continuous (not limited to periods of stress) for at least two years, is not due to another mental disorder, such as Schiz-

The concept that a person of one sex is uncomfortable with the societal role assigned to that sex, except in certain rare genetic disorders, is defined as transsexualism. Controversy exists in the management of such people. Treatment, as it is offered by some in the medical and psychiatric community, may involve psychotherapy as well as hormonal or surgical manipulation.

\* \* \* \* \* \*

In our opinion, the proper treatment for people who have a normal genetic complement, who feel that nature has assigned them the wrong sexual characteristics, remains firmly in the providence of psychotherapy, not in hormonal or surgical manipulation.

It is possible that other physicians have different opinions on this subject. It is also possible that other physicians, given the same facts, would not hesitate to prescribe conjugated estrogens for this person. However, we restate that we cannot ethically prescribe conjugated estrogens for this person, given the facts of this case and given the risks that estrogens pose to this person's health.

> ophrenia, and is not associated with physical intersex or generic abnormality.
>
> Individuals with this disorder usually complain that they are uncomfortable wearing the clothes of their own anatomic sex, frequently this discomfort leads to cross-dressing (dressing in clothes of the other sex). Often they choose to engage in activities that in our culture tend to be associated with the other sex. These individuals often find their genitals repugnant, which may lead to persistent requests for sex reassignment by surgical or hormonal means.
>
> To varying degrees, the behavior, dress, and mannerisms are those of the other sex. With cross-dressing, hormonal treatment, and electrolysis, a few males with this disorder will appear relatively indistinguishable from members of the other sex. However, the anatomic sex of most males and females with the disorder is quite apparent to the alert observer.

*Id.* at 261–262. For purposes of the present action, the court will assume *arguendo* that plaintiff is suffering from a serious medical condition. *Cf. Meriwether v. Faulkner*, 821 F.2d 408, 411–413 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987).

The court will not second-guess the decision made by the above-named physicians. At best, plaintiff has established a difference of opinion as to how best to treat transsexualism, and this is insufficient to state a cause of action. *See Meriwether v. Faulkner,* 821 F.2d at 413 (transsexual does not have a right to any particular type of treatment, such as estrogen therapy, provided some other treatment option is made available); *Supre v. Ricketts,* 792 F.2d 958, 963 (10th Cir.1986) (court was "unable to conclude that federal law requires prison officials to administer female hormones to transsexual inmate"); *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977); *Lamb v. Maschner,* 633 F.Supp. 351 (D.Kan.1986) (no constitutional right to pre-operative hormone treatment and sex change operation).

■ Regarding the denial of psychiatric treatment, plaintiff claims that he did not receive any psychiatric treatment until February 6, 1987, despite having requested such treatment two months earlier. *See* document 44 of record. Plaintiff also contends that the psychologist who did visit him did not "conform to certain acceptable standards of reasonable medical care." *Id.* In response, defendants submitted several documents outlining the psychological treatment afforded plaintiff while at Lewisburg. He was interviewed on three occasions at his cell, namely February 6 and 17, 1987 and March 13, 1987, and on another occasion, staff who regularly observed plaintiff were questioned concerning his behavior. *See* document 25 of record, Declaration of Dr. Charles Williamson, Attachment; Declaration of W. Alan Smith, Attachment. An anti-depressant was prescribed to combat plaintiff's insomnia and depression. *See id.* On all occasions, his behavior was found to be within normal limits. *See id.*

Viewing all the facts in the light most favorable to plaintiff, the court concludes that a reasonable jury would not return a verdict in his favor. Plaintiff's sole allegation is that, during his four and one-half month stay at Lewisburg, his request for psychiatric treatment was delayed for "almost two months." Subsequently, however, plaintiff was examined three times by the psychiatric staff and was prescribed medication to treat his depression. While plaintiff complains of the quality of the treatment he was afforded, this does not state a viable claim, given the "deliberate indifference" standard announced in *Estelle v. Gamble. See Bowring v. Godwin,* 551 F.2d at 48 ("courts will not intervene upon allegations of mere negligence, mistake or difference of opinion"). As this court finds no such deliberate indifference in the present case, plaintiff's allegation of improper medical care must be denied.

*Due Process*

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that a prisoner has no protected liberty interest in being confined in the general prison population rather than in restrictive segregation. Applying the standard set out in *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) and *Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) ("changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process clause '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him' "), the Court concluded that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 869, 74 L.Ed.2d 675. Given the broad uses of administrative segregation, including to protect the prisoner's safety and to await later classification or transfer, the Court held that inmates should reasonably anticipate being confined in administrative segregation at some point in their incarceration. *Id; see also Meriwether v. Faulker,* 821 F.2d 408, 414 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 311, 98 L.Ed. 2d 269 (1987).

In *Mims v. Shapp,* 744 F.2d 946 (3d Cir.1984), the Third Circuit recognized that *Hewitt* allows prison administrators to rely

on "purely subjective evaluations and on predictions of future behavior" in making administrative segregation determinations. *See id.* at 951 (quoting *Hewitt v. Helms,* 459 U.S. at 472, 103 S.Ct. at 872, 74 L.Ed.2d 675). This is so for the following reasons:

When prison officials are confronted with a substantial threat to internal security.... the government interest in formulating food faith and reasoned responses to such threats-including the relatively drastic measure of administrative segregation-is compelling. It follows that the level of judicial deference to the prison officials' attempts to deal with such threats should be high. However, we acknowledge that the government interest involved in a good faith decision to subject a prisoner to administrative segregation may fluctuate with the passage of time and change of circumstances. The validity of the government's interest in prison safety and security as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk. It was upon this basis that the *Hewitt* Court noted that periodic review of administrative segregation decisions is necessary ...

*Id.* at 953–954.

■ Defendant's reasons for placing plaintiff in administrative detention are outlined in defendant Essig's response to plaintiff's administrative appeal. Defendant Essig there states the following:

You appeal the institution's decision to maintain you in administrative detention pending transfer. You contend that you do not need extra security precautions and request relief by a release into the general population. Institution staff are charged with maintaining the security and order of an institution and protecting all inmates within it. Where a threat to security exists, staff may take reasonable steps to alleviate a threat. In your case, institutional staff finds that a situation exists which may endanger your life in the general population. While steps are being taken to move you to a facility where extra security will not be necessary, it is appropriate to keep you separated from anyone who may harm you.

As staff base their decision to keep you in administrative detention on a valid security concern, there is no basis to overturn their decision to grant you the relief you request. Accordingly, your appeal is denied.

*See* document 25 of record, Edwards Declaration, Attachment B. Clearly, placing plaintiff, a twenty-one year old transsexual, into the general population at Lewisburg, a Level Five security institution, could pose a significant threat to internal security in general and to plaintiff in particular. *See Lamb v. Maschner, supra* (transsexual filed section 1983 action based, in part, on sexual harassment and molestation). Thus, the court will defer to the prison officials' decision to keep plaintiff in administrative segregation pending transfer to another institution.

■ The only remaining consideration is whether plaintiff received the necessary periodic reviews of the administrative segregation decisions. *See Mims v. Shapp,* 744 F.2d at 954. The court concludes that he did. Plaintiff received a memorandum detailing the reasons he was placed in administrative segregation within 24 hours of his placement, in accordance with 28 C.F.R. section 541.22(b), and the matter was referred to the IDC. *See* document 25 of record, Declaration of James McPherson, Attachment 2. Plaintiff's status was reviewed by the UDC on November 14, 1986 and by the IDC on November 19, 1986. *See id.,* Attachment 6. Plaintiff then received thirty (30) day reviews on December 12, 1986, January 14 and 30, 1987, and February 27, 1987. *See id.* As stated previously, plaintiff was transferred on March 17, 1987. Thus, whatever liberty interest a federal prisoner might have in remaining in the general population was protected by the procedural protections here employed. *See Hewitt v. Helms,* 459 U.S. at 476–477. 477 n. 9, 103 S.Ct. at 874 & n. 9, 74 L.Ed.2d 675 ("inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation," along with "some

sort of periodic review of the confinement of such inmates").

## Cruel and Unusual Punishment

██ Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. *Newman v. State of Alabama,* 559 F.2d 283, 291 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Loe v. Wilkinson,* 604 F.Supp. 130, 132 (M.D.Pa.1984) (Nealon, C.J.). The test to determine whether an inmate is subjected to cruel and unusual punishment is whether the resulting conditions, alone or in combination, deprive the inmate of the minimized civilized measure of life's necessities as measured under contemporary standards of decency. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Loe v. Wilkinson,* 604 F.Supp. at 132. In considering the totality of the circumstances, the court must examine all of the circumstances that bear on the nature of the shelter provided. *Union County Jail Inmates v. DiBuono,* 713 F.2d 984, 999 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984); *Loe v. Wilkinson,* 604 F.Supp. at 132.

██ In the present action, plaintiff complains that, by being confined in administrative segregation, he was denied adequate recreation and exercise, assistance from jailhouse lawyers,[6] psychological counseling, and equal access to the same rehabilitational programs offered to the inmates in general population. Plaintiff also claims that he was denied recreation and showers "on days they were suppose [sic] to be given," that he was required to wear manacles whenever he left his cell, and that he was subjected to "unwarranted" searches by defendants. *See* document 21 of record, Amended Complaint, para. 38; document 44 of record.

Plaintiff does not allege that he was denied the opportunity for recreation. He complains instead that one hour of exercise a day, five days a week was insufficient.

This court has already found that one hour of exercise, five days a week is sufficient when all other conditions in the unit are adequate. *See Loe v. Wilkinson,* 604 F.Supp. at 135. *Loe* also disposes of the remainder of plaintiff's claims:

With regard to educational opportunities, and the balance of the plaintiff's claims concerning administrative detention, it is true that some opportunities and privileges given to members of the general population are not afforded inmates confined in the S.H.U. However, if the prisoner is furnished with reasonably adequate basic necessities (*e.g.* food, clothing, shelter, sanitation, medical care and personal safety), so as to avoid the imposition of cruel and unusual punishment, prison official's obligations under the Eighth Amendment are satisfied. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity a prisoner may think is needed to avoid mental, physical or emotional distress ... The plaintiff was afforded the basic human needs required by the Eighth Amendment. The court finds that the restrictions the plaintiff had to endure during his stay in administrative detention—lack of educational programs, diminished access to the general library, denial of participation in group entertainment programs, limited use of the telephone—were a necessary part of prison security and do not amount to an infliction of cruel and unusual punishment. *See id.* at 135–136.

In *Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9, 74 L.Ed.2d 675, the Court expressed its concern that administrative segregation not be used as a pretext for indefinite confinement of an inmate. This court recognizes that the duration of a prisoner's confinement in administrative segregation is an important factor in determining whether the totality of the conditions of confinement constitutes cruel and unusual punishment. *See Meriwether v. Faulkner,* 821 F.2d at 416. Here, plain-

---

6. Plaintiff's claim regarding the denial of assistance from jailhouse lawyers will be discussed

*infra* at pp. 1344–1345.

tiff spent only four and one-half months in administrative segregation at U.S.P.—Lewisburg. The decision was made by defendants in December of 1986 to transfer plaintiff to another institution, *see* document 25 of record, Declaration of Calvin Edwards, Attachment B, and plaintiff was in fact transferred in March of 1987. This is clearly a proper utilization of administrative segregation. *See* 28 C.F.R. section 541.22(a)(4), (5); *cf. Meriwether v. Faulkner, supra.*

*Equal Protection*

In the absence of fundamental rights or a suspect classification, equal protection requires only that a classification that results in unequal treatment bear some rational relationship to a legitimate state purpose. *Wright v. Cuyler,* 517 F.Supp. 637, 643 (E.D.Pa.1981). More specifically, "[t]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the objective of the legislation, so that all persons similarly circumstanced shall be treated alike." *Jamieson v. Robinson,* 641 F.2d 138, 142 (3d Cir.1981) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–562, 64 L.Ed. 989 (1920)). In evaluating a prisoner's equal protection claim, however, the court should not lose sight of the discretion necessarily vested in prison officials. *See Hewitt v. Helms, supra.* As stated by the court in *Rowe v. Cuyler,* 534 F.Supp. 297 (E.D.Pa.1982), *aff'd,* 696 F.2d 985 (3d Cir.1982),

> no two prisoners, being different human beings, will possess identical backgrounds and characters. Indeed, it is difficult to believe that any two prisoners could ever be considered "similarly situated" for the purpose of judicial review on equal protection grounds of broadly discretionary decisions because such decisions may legitimately be informed by a broad variety of an individual's characteristics.

*Id.* at 301. Thus, the function of the court is limited to ensuring that, in placing plaintiff in administrative segregation, defendants were, in fact, exercising their professional judgment and not discriminating against him for reasons unrelated to their legitimate security interests. *Wright v. Cuyler,* 517 F.Supp. at 644; *see also Durso v. Rowe,* 579 F.2d 1365, 1372 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979) ("a mere inconsistency in prison management may not in itself constitute a cognizable equal protection claim").

Here, plaintiff generally alleges discrimination on the basis of sex and age. The court, however, can find no classification based on either factor. Plaintiff is a male, as are all the other inmates at Lewisburg. He does not attempt to explain his assertion of discrimination based on age, other than to state that such discrimination exists. *See* document 44 of record. As stated previously, however, plaintiff may not rely on the allegations of his complaint but must counter defendants' affidavits or risk having them taken as true. In any event, from the materials presented to the court by defendants, and from what has already been said by this court, it is obvious that, in placing plaintiff in administrative segregation, defendants were exercising their professional judgment in an attempt to eliminate a potential threat to internal security. Plaintiff's equal protection claim must therefore be rejected.

*Right of Access to Court*

Plaintiff's final claim is that defendants' denying him the assistance of a jailhouse lawyer while he was confined in administrative segregation constitutes a denial of access to the courts. Here, plaintiff does not claim that he was denied adequate access to the law library itself, and the materials submitted by defendants show that plaintiff was afforded such access. *See* document 25 of record, Declaration of James McPherson, Attachment 3 (Law Library Log Book). Furthermore, plaintiff does not contest that he was denied the assistance of an inmate based on the same security reasons that resulted in his initial placement in administrative segregation. *See* document 25 of record, Declaration of Calvin Edwards, Attachment B. His only allegation relates to the denial of inmate assistance. *See* document 21 of record,

Amended Complaint, at para. 38(c); document 44 of record.[7]

In *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the United States Supreme Court held that, absent some reasonable alternative to assist prisoners who were unable themselves, with reasonable adequacy, to prepare their post-conviction petitions, the state may not validly enforce a regulation barring inmates from furnishing such assistance to other prisoners. *Id.* at 489, 490, 89 S.Ct. at 750, 751, 21 L.Ed.2d 718. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Court generally held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498, 52 L.Ed.2d 72. The purpose of these holdings was "to insure that inmate access to the courts is adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. at 822, 97 S.Ct. at 1495, 52 L.Ed.2d 72.

Here, plaintiff has been afforded adequate, effective, and meaningful access to the courts. Unlike the prisoner in *Johnson v. Avery*, plaintiff is literate and, judging from his submissions to this court, he is more than capable of preparing and presenting his claims with reasonable accuracy. While plaintiff seeks the aid of other inmates, this alternative is foreclosed by the reasonable requirements of prison security. In such a situation, prison officials will have satisfied the inmates' right of meaningful access to the courts by providing an adequate law library. *Bounds v. Smith*, 430 U.S. at 828, 97 S.Ct. at 1498, 52 L.Ed.2d 72 (1977). As stated previously, plaintiff does not challenge the adequacy of the law library at U.S.P.—Lewisburg, nor does he contend that he did not have adequate access to that library. His submissions to this court have generally been "reasonably accurate" and have cited the relevant authorities. The fact that plaintiff is ultimately unsuccessful does not mean he has been denied meaningful access to the courts. *Id.* at 826–827, 97 S.Ct. at 1497, 52 L.Ed.2d 72.

### *Federal Rule of Civil Procedure 56(f)*

■ One final issue is before the court. Fed.R.Civ.P. 56(f) provides as follows:

Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In connection with his response to defendant's motion for summary judgment, plaintiff submitted an affidavit pursuant to Rule 56(f). Plaintiff claims that he has "not been able or had ample opportunity" to get various affidavits and that these affidavits and documents could have supported his claims regarding inadequate medical treatment and the denial of due process, equal protection, and a "jailhouse lawyer." *See* document 44 of record, Affidavit, Rule 56 Fed.R.Civ.P.

The record demonstrates that plaintiff has had ample opportunity to seek the documents to which he refers. Plaintiff instituted the present action on February 11, 1987. Defendants filed the current motion for summary judgment on August 28, 1987, and their supporting brief followed on September 14, 1987. Although due on September 29, 1987, plaintiff succeeded in delaying his response to that motion until November 9, 1987. *See generally* document 42 of record. Plaintiff does not explain to the court's satisfaction why he could not have gained the necessary information during this nine month period.

Nevertheless, the court has examined plaintiff's claims in depth and concludes that the additional information would not

---

7. As part of his response to defendants' summary judgment motion, plaintiff submitted an affidavit pursuant to Fed.R.Civ.P. 56(f). In that affidavit, plaintiff states that all of his filings were prepared by an inmate Jenkins, a "jailhouse lawyer." *See* document 44 of record, Affidavit, Rule 56, Fed.R.Civ.P. Accepting this as true, plaintiff's claim that he was denied such assistance would obviously be moot. The court will therefore examine plaintiff's argument as if plaintiff himself had submitted his filings without the assistance of another inmate.

create a genuine issue of material fact. Plaintiff has already presented this court with a great deal of information. At best, he has established a difference of opinion as to his medical treatment at Lewisburg. As hereinbefore mentioned, this is insufficient to state a viable cause of action. Even accepting the statements in his amended complaint as true and examining all the pleadings in a light most favorable to plaintiff, his due process and equal protection arguments are meritless. Finally, as stated *supra* at n. 7, plaintiff admits in his Rule 56(f) affidavit that all of his filings were prepared by a jailhouse lawyer, and so his claim regarding the denial of inmate assistance is moot. Thus, as the court is convinced that the additional information would be of no aid to plaintiff, his request pursuant to Rule 56(f) will be denied.

The court has examined plaintiff's claims and finds them to be without merit. Defendants' motion for summary judgment will therefore be granted, and the Clerk of Courts will be directed to close this case.[8] An appropriate Order will enter.

### ORDER

NOW, this 29th day of February, 1988, in accordance with the accompanying Memorandum, IT IS HEREBY ORDERED THAT:

(1) Defendants' motion for summary judgment is granted.

(2) Judgment is hereby entered in favor of defendants.

(3) Plaintiff's request for a continuance pursuant to Fed.R.Civ.P. 56(f) and motion for an order compelling discovery are denied.

(4) Any appeal from this Order will be deemed frivolous, lacking in probable cause, and not taken in good faith.

(5) The Clerk of Courts is directed to close this case.

---

8. Given the court's holding as to defendants' summary judgment motion and plaintiff's request pursuant to Fed.R.Civ.P. 56(f), plaintiff's motion for an order compelling discovery, filed on November 27, 1987, will be denied as moot.